Laxon v. State.

## J. W. LAXON *v.* STATE.

*(Jackson.* April Term, 1912.)

1. **STATE'S JURISDICTION.** In criminal cases extends to Island No. 21 in Mississippi river by cession of the United States and its acquiescence in the State's exercise of its jurisdiction over it.

The land embraced in what is now known as "Island No. 21," formerly known as "Cut-Off Island," lay entirely west of the Mississippi river in 1763, and so remained until 1821 or 1822, and it became the property of France in 1763 by treaty of that date between England, France, and Spain, and was part of the land ceded by France to the United States in 1803; and, therefore, while such land was not a part of the land now in Tennessee that was ceded to the United States by North Carolina in 1789; and since the channel of said river changed by avulsion previous to the admission of Arkansas as a State in the union in 1836, so as to form such island and to leave it east of the middle line of the said river, it was never a part of the State of Arkansas. In 1834, Tennessee made provision, by its constitution (art. 1, sec. 31), continued in the constitution of 1870, for the extension of its limits and jurisdiction over any lands already acquired by it, or which should be thereafter acquired by it, and in 1846 (act of August 7, 1864, ch. 92, 9 Stat., 66) the United States ceded to Tennessee absolutely all unappropriated lands in the said State, after which Tennessee assumed and exercised full jurisdiction over said island, in which the United States acquiesced, so that the United States surrendered, and Tennessee acquired, absolute jurisdiction over said island. (*Post, pp.* 303-311.)

Constitution cited and construed:     Art. 1, sec. 31.

Cases cited and approved: Moss v. Gibbs,. 10 Heisk., 283, 294-296; State v. Pulp Co., 119 Tenn., 47.

Laxon v. State.

2. **COUNTY'S JURISDICTION.** Venue of offense committed on an island not in its boundaries, but over which the county exercised jurisdiction by acquiescence of State since 1823.

The venue of a criminal offense, committed on Island No. 21 in the Mississippi river, is in the county of Dyer in the State of Tennessee, though such county, as originally laid off in 1823, did not embrace such island; where such island belonged to Tennessee, and was not claimed by any other county, and Dyer county assumed and exercised jurisdiction over it and over the taxpayers living upon it ever since said year of 1823, with the acquiescence of said State. If the State acquiesces in the county's jurisdiction, the accused cannot object. (*Post, pp.* 311, 312.

FROM DYER.

Appeal from the Circuit Court of Dyer County.—Jos. E. Jones, Judge.

Williams & Ward, for Laxon.

Assistant Attorney-General Faw, for State.

Mr. Justice Neil delivered the opinion of the Court.

The plaintiff in error was indicted in the circuit court of Dyer county for the murder of Alex Brown, and was convicted of murder in the second degree, and sentenced to a term of ten years' imprisonment in the State penitentiary, from which judgment he has appealed and assigned errors.

The homicide was committed on Island No. 21, which is surrounded by the Mississippi river on its western

border, and a slough on the eastern side; the two together making an island.

The only question we shall consider in this opinion is the venue.

It is said that this island is not within the State of Tennessee, and therefore the courts of the State have no jurisdiction of an offense committed there.

This contention is based on the following facts:

In 1763, by a treaty made between England, France and Spain, the middle of the channel of the Mississippi river was made the boundary line between the dominions of these powers; the English possessions lying east of this middle line of the river. At that time what is now Island No. 21, or the land which it embraces, lay entirely west of the river, and hence within the dominions of France. This was the situation also when North Carolina ceded to the United States the territory subsequently erected into the State of Tennessee. In 1803 the United States by a treaty with France became the owner of the territory west of the river, as it then stood. There are still visible at least two of the old channels, one of them a considerable distance inland. In 1821 or 1822 the river, by an avulsion, cut for itself a new channel west of Island No. 21. In 1836 the State of Arkansas was admitted into the Union, under a geographical description which made its eastern boundary the middle line of the Mississippi river as it then ran. So that it appears that Island No. 21 never belonged to the State of North Carolina, and hence was not within the land ceded by that State to the United States, and subse-

quently made the State of Tennessee. It never was the property of Arkansas, because when that State was erected the avulsion had already occurred, and the middle line of the river lay west of this island. However, it became the property of the United States by the treaty of 1803. The precise question as to the ownership of this island is discussed in the case of *Moss* v. *Gibbs,* in 10 Heisk., 283; it appearing from the evidence in the present case that the island there mentioned as "Cut-Off Island" is the same mentioned in this case as Island No. 21. In treating this question the court said:

"Does the title to the island still continue in the United States, or has it passed by any act of the United States to the State of Tennessee? The United States obtained title to the western territory of North Carolina by the cession of 1789, burthened with various terms and conditions, in respect to the satisfaction of existing rights created by entries and military warrants. But as the island in controversy was not acquired from North Carolina by the cession of 1789, her title was not encumbered with any of these terms and conditions. The title was derived from France, and was absolute and unencumbered.

"By an act of congress of 1806, the line known as the 'congressional reservation line' was defined, and by this act all the lands north and east of this line were ceded to the State of Tennessee, and the lands south and west of this line were to remain at the sole and entire disposition of the United States; the State agreeing to relinquish all right, title, and claim thereto.

126 Tenn.—20

"By an act of congress of 1818, the State of Tennessee was authorized to issue grants and perfect title on all special entries and locations of lands, made pursuant to the laws of North Carolina before the 25th of February, 1790, which were good and valid in law, and recorganized by the cession act passed in 1789, and which lay south and west of the congressional reservation line. It is seen that this act had special reference to the territory acquired by the United States from North Carolina, and therefore could in no way affect the title to the island, which then was on the west side of the Mississippi river. Down to this period, the United States had taken no steps for the disposition of the lands south and west of the congressional reservation line, except as provided in the act of 1818. But in 1841 an act was passed by congress 'that the State of Tennessee be and is hereby constituted the agent of the government of the United States, with full power and authority to sell and dispose of the vacant, unappropriated, and refuse lands within the limits of said State, lying south and west of the line commonly called the congressional reservation line.' [Act Feb. 18, 1841, ch. 7, 5 Stat., p. 412.] This agency was coupled with the trust of satisfying all legal and *bona fide* claims of North Carolina upon said lands.

"In 1846, congress passed an act by which 'the United States hereby release, and surrender to the State of Tennessee, the right and title of the United States to all lands in the State of Tennessee lying south and west of the congressional reservation line in said State, which

may yet remain unappropriated, with this proviso: That all ·the said lands the release of which is herein provided for, and the proceeds thereof, shall be and remain subject to all the same claims, incumbrances and liabilities in relation to North Carolina's land warrants, or other claims of North Carolina, as the same could or would be subject to as regards the United States, if the same were not so as aforesaid released.' [Act Aug. 7, 1846, ch. 92, 9 Stat., 66.]

·"By reference to the boundaries of the State of Tennessee, as fixed by the constitution of 1796, it is clear that the island in controversy was not within her limits. After describing a dividing line between North Carolina and Tennessee, it is declared 'that all the territory, lands and waters lying west of said line, and contained within the chartered limits of North Carolina, are within the boundaries and limits of the State of Tennessee.' The middle of the main channel of the Mississippi river being the western boundary, and the island then being west of the main channel, it follows that it was not within the limits of North Carolina, and therefore not ·within the limits of Tennessee.

"But by the constitution of Tennessee of 1834 [article 1, section 31], a material addition was made to the definition of the boundaries of the State. After describing the boundaries as in the constitution of 1796, this proviso was added: 'That the limits and jurisdictions of this State shall extend to any other land and territory now acquired, or that may hereafter be acquired by compact or agreement with other States, or other·

wise, although such land and territory are not included in the boundaries hereinbefore designated.'

"Under the provisions of this constitution (and they are the same as that of 1870), the State of Tennessee had jurisdiction over any lands not included within her original boundaries, which she had then acquired, or might thereafter acquire by compact or otherwise. If, then, the State of Tennessee, in 1834, had jurisdiction over the island in controversy, or if she has since acquired such jurisdiction, it is wholly immaterial that the island may originally have been situated west of the western boundary.

"It is in proof that as early as 1826 the State of Tennessee, through her various officers, judicial and ministerial, claimed and exercised jurisdiction over the island, but as against the United States, in which the title was vested, this claim and exercise of jurisdiction did not and could not vest the title in the State; but this continued exercise of jurisdiction may be legitimately looked to in determining the question whether there is still in the United States a present, valid, *bona fide*, subsisting title.

"In determining this question, the first act of the United States which deserves attention is the recognition in 1836, by the admission of Arkansas into the Union, of the middle of the Mississippi river, as it then was, as the eastern boundary of that State. Before that time the territory of Arkansas and the State of Tennessee had the middle of the main channel of the river as it was in 1803 as a common boundary line. The United

States had the legal right to the lands on both sides of the line, and therefore had a right to agree to the change in the line, resulting from the change in the main channel of the river. This fact furnishes persuasive evidence that in recognizing the eastern boundary of Arkansas as running through the main channel of the river, through the cut-off, the United States also recognized that line as the western boundary of Tennessee. This inference is strengthened by the fact that in the act of 1841, constituting Tennessee an agent to dispose of the lands south and west of the congressional reservation line, all the vacant, unappropriated, and refuse lands within the State were designated without making any exception as to the island added to the territory of Tennessee by the avulsion of 1822.

"But the final action of congress in releasing and surrendering the title to the lands south and west of the congressional reservation is still more conclusive. The act for this purpose was passed in 1836, and in response to a memorial of the general assembly of Tennessee, adopted in 1845. In that memorial the language was: 'Your memorialists would earnestly, but respectfully, urge upon congress both the propriety and justice of ceding to the State of Tennessee all the vacant and unappropriated lands south and west of the congressional reservation line, for the purposes of education,' etc. In pursuance of this memorial, the congress enacted that 'the United States hereby release and surrender to the State of Tennessee, the right and title of the United States to all lands in the State of Tennessee, lying

Laxon v. State.

south and west of the congressional reservation line in said State, which may yet remain unappropriated, etc. That the United States intended by this act to surrender to Tennessee her entire title to all vacant and unappropriated lands within her boundaries as they were then recognized is made certain by the fact that from that time to the present, no claim has been set up by the United States to any public land in the State.

"In view of all these facts and circumstances, it cannot be said that the United States has a present, subsisting, legal, and *bona fide* title to the land in controversy, and that the title formerly vested in the United States has not been abandoned and surrendered to the State of Tennessee. On the contrary, the conclusion is irresistible that by the act of 1846, the United States surrendered and released to the State of Tennessee all right and title to the land in controversy, and by virtue of the constitution of 1834 the State has, since that time, possessed and exercised exclusive control and jurisdiction thereof, and that the same was subject to appropriation by entry and grant in pursuance of the laws of the State." 10 Heisk., 294-296.

It is said, however, that this case was overruled by the later case of *State* v. *Pulp Co.*, 119 Tenn., 47, 104 S. W., 437. We are at a loss, however, to see how there is any conflict between these two cases. In the case last cited the court was not dealing with the principles involved in *Moss* v. *Gibbs*, further than the one proposition that the middle of the river is the line between adjoining States, and the two cases are at one upon that

subject.  In *State* v. *Pulp Co.*, the chief proposition in controversy was one advanced by the Pulp Company, to the effect that the boundary line was the middle of the channel of navigation.  In that case the court held, as it·also held in *Moss* v. *Gibbs*, that when a river is the dividing line between two States an avulsion does not change the line, and further held that what was the western line of Tennessee before the avulsion of 1875, which affected the particular line in controversy in that case, still remained the line, and that the State of Tennessee had the right then to grant up to the middle line the lands lying in the old bed of the river, which it had deserted by the avulsion last named.  In *Moss* v. *Gibbs* the court held likewise that the avulsion of 1822 did not change the line previously existing between Tennessee and the territory of Arkansas, but that subsequent acts of congress, and long acquiescence in the use by Tennessee of the property as a part of its domain, had resulted in the necessary conclusion that the United States no longer had or held ownership of the island in question. The doctrine of acquiescence announced in *Moss* v. *Gibbs* is fully recognized in the later case of *State* v. *Pulp Co.*

It is said, however, that the lines of Dyer county, as originally laid off in 1823, did not embrace this particular island.  This is true; nevertheless, ever since that time Dyer county has assumed jurisdiction over this land, and persons living there have paid taxes to Dyer county and voted in that county, and this has never been questioned by the State, and no other county

has any claim to it. This being true, it must be held that the State has acquiesced in the claim of Dyer county to this land, and it must be treated as a part of the county. If the State consents, the prisoner cannot object.

The other questions made have been fully considered by the court, but are without merit, and are overruled.

The result is the judgment must be affirmed.